# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Estate of DiMatteo*, 2013 IL App (1st) 122948

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF RICHARD DiMATTEO, Deceased (Thomas Golly, Petitioner-Appellant, v. Clint Eastman, Individually, and as Independent Executor of the Estate of Richard DiMatteo, Respondent-Appellee). |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-2948 |
| Filed | August 16, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where petitioner sufficiently pleaded facts that could prove undue influence and tortious interference with his testamentary expectancy in connection with decedent's execution of a will revoking his prior will naming petitioner as the executor of his estate and giving his entire estate to petitioner and making respondent the executor and recipient of his entire estate, the dismissal of petitioner's will contest was reversed, and the cause was remanded with leave to allow petitioner to amend his petition to show how he discovered the facts he pleaded on information and belief. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-P-003915; the Hon. John J. Fleming, Judge, presiding. |
| Judgment | Reversed and remanded with instructions. |

| | |
|---|---|
| Counsel on Appeal | Kevin J. Todd and John C. Lillig, both of Hoogendoorn & Talbot, LLP, of Chicago, for appellant. |
| | Donald M. Thompson, of Chicago, for appellee. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion. Presiding Justice Lampkin and Justice Hall concurred in the judgment and opinion. |

**OPINION**

¶ 1      Two months before he passed away, decedent Richard DiMatteo executed a will naming respondent Clint Eastman executor of his estate and giving his entire estate to Eastman. This will revoked a previous will, which named petitioner Thomas Golly executor and gave DiMatteo's entire estate to Golly. After Eastman filed a petition to probate DiMatteo's new will and request his letters testamentary, Golly filed a petition to contest and invalidate the will. The petition contained two counts: (1) undue influence; and (2) tortious interference with testamentary expectancy.

¶ 2      Eastman filed a motion to dismiss under section 2-615 of the Illinois Code of Civil Procedure (735 ILCS 5/2-615 (West 2010)), arguing that Golly failed to plead sufficient facts to state a claim for both counts. The probate division granted Eastman's section 2-615 motion and dismissed the petition with prejudice. Golly appeals, and for the following reasons, we reverse.

¶ 3      BACKGROUND

¶ 4      Decedent Richard DiMatteo, a resident of Cook County, Illinois, passed away on June 14, 2011. On April 8, 2011, two months before he passed away, DiMatteo executed a will naming respondent Clint Eastman executor of his estate and "giv[ing] all the rest and residue of my estate of every kind and character, whether real or personal, wherever situated, including lapsed legacies, but expressly excluding any property over which I may have power of appointment at my death" to Eastman (the 2011 will). The 2011 will revoked "all prior wills and codicils." DiMatteo had previously executed a will on April 26, 2010 (the 2010 will), which the 2011 will revoked. The 2010 will named petitioner Thomas Golly as executor and gave "all the rest and residue of my estate of every kind and character, whether real or personal, wherever situated, including lapsed legacies, but expressly excluding any property over which I may have power of appointment at my death" to Golly. If Golly did not survive by 30 days, DiMatteo's estate would pass to Golly's grandson, Thomas McIntosh

Golly. If Golly's grandson was a minor at the time he inherited DiMatteo's estate, "payment [would be] made for the benefit of Golly's grandson to a custodian under the Uniform Gifts or Transfers to Minors Act."

¶ 5    On June 16, 2011, two days after DiMatteo passed away, Eastman filed a petition to probate the 2011 will and for the issuance of letters testamentary in the probate division of the circuit court of Cook County. Eastman attached a list of heirs and legatees, which listed two of DiMatteo's cousins as heirs,[1] and listed Eastman as a legatee. The list stated that Eastman was DiMatteo's friend. On December 12, 2011, Golly filed a petition to contest and invalidate the will. The petition included two counts: (1) undue influence and (2) tortious interference with testamentary expectancy. Eastman filed a motion to dismiss the petition under section 2-615 of the Illinois Code of Civil Procedure (735 ILCS 5/2-615 (West 2010)), arguing that Golly failed to state a cause of action. On May 1, 2012, the probate division granted Eastman's motion without prejudice and gave Golly leave to file an amended petition. Golly filed an amended petition on May 31, 2012, and it is this petition that serves as the basis for this appeal.

¶ 6                          I. The Amended Petition

¶ 7    Golly alleges the following in his amended petition.

¶ 8                          A. The Parties

¶ 9    DiMatteo lived alone in Riverside, Illinois. DiMatteo never married, had no children, and was not close with his extended family. DiMatteo passed away after a "precipitous decline in his health in the last few months of his life." The petition further alleges that DiMatteo was suspicious of others and paranoid, and exhibited paranoid characteristics. He did not develop trust or friendships quickly.

¶ 10    Golly is a farmer residing on his family farm in Winnebago, Minnesota. In the early 2000s, DiMatteo purchased farmland adjacent to Golly's family farm.

¶ 11    Eastman resides in Winnebago, Minnesota, and worked for Golly as a farmhand. Eastman is not related to DiMatteo by blood or marriage, and, on information and belief, Eastman "was, at most, a passing acquaintance of the decedent prior to the sharp decline in decedent's health in the last few months of decedent's life, at or about the time the 2011 Will was executed."

¶ 12                    B. DiMatteo's Relationship With Golly

¶ 13    From the time DiMatteo purchased his farm property in Minnesota, Golly rented it from DiMatteo. During his visits to Minnesota, DiMatteo became friends with Golly and his family, and often stayed with the Golly family. DiMatteo spent multiple summers in Minnesota and stayed rent-free in a house occupied by Golly and his family.

---

[1]The list also stated "Unknown heirs."

¶ 14 Over the course of the time that DiMatteo spent in Minnesota, he became close with Golly and his family, and the Gollys treated DiMatteo as a member of their family. DiMatteo also became close with Golly's grandson, Thomas McIntosh Golly,[2] and DiMatteo frequently played with Golly's grandson and gave him gifts. DiMatteo regularly asked Golly and his family, including Golly's son Todd Golly, for assistance with various projects and needs. Some of these needs required traveling from Minnesota to Illinois to assist DiMatteo with medical issues, including taking DiMatteo to the hospital and to healthcare providers.

¶ 15 At various times, DiMatteo informed Golly that he intended to include Golly in his will because of their long and close friendship, because of the kindness and assistance Golly and his family had provided him over the years, and because he was not close with his own family. In or about April 2010, DiMatteo suffered a stroke. He contacted Golly and requested that Golly travel from Minnesota to Central DuPage Hospital in Winfield, Illinois, where DiMatteo was hospitalized. Golly provided DiMatteo with any assistance DiMatteo requested, including settling DiMatteo in his residence after he was discharged from the hospital. On or about April 26, 2010, DiMatteo executed the 2010 will, naming Golly as executor and leaving his entire estate to Golly, or, in the event that Golly did not survive DiMatteo by 30 days, to Golly's grandson. Golly had no involvement in the preparation of the 2010 will, nor did he encourage DiMatteo to include him or any of his family members in the will. DiMatteo also appointed Golly his agent under a power of attorney for healthcare decision making. "At some point thereafter," DiMatteo gave Golly a copy of the 2010 will and told Golly that he had given him the power of attorney over his healthcare. DiMatteo informed Golly that he had provided for him because of the close friendship DiMatteo had with Golly and his family, "who had done so much for him over the years."

¶ 16                                   C. Eastman's Influence on DiMatteo

¶ 17 DiMatteo's health continued to decline following his April 2010 stroke, and "sharply declined in the last few months of his life, from March [2011] until his death on June 14, 2011." The petition further states that, on information and belief, DiMatteo suffered from additional strokes, which physically weakened him, and suffered from leukemia, which was in its end stages in March 2011. DiMatteo's emotional and mental condition and stability declined along with his physical condition. As a result, the petition concluded that DiMatteo was "increasingly dependent on others and vulnerable to the influence of others."

¶ 18 In March 2011, DiMatteo purchased a house in Blue Earth, Minnesota, near Winnebago. DiMatteo asked Golly to help him move from his Riverside residence to Minnesota, and Golly agreed to help. Golly had recently undergone knee replacement surgery, so he enlisted the help of Eastman, one of his farmhands. On March 12, 2011, Golly, his son, and Eastman drove to DiMatteo's Riverside residence to pack up his belongings. The petition further alleges that, on information and belief, prior to this trip, Eastman and DiMatteo had only been casual acquaintances, having met at Golly's farm when DiMatteo was residing there and Eastman was working there.

---

[2]The petition does not state the age of Thomas McIntosh Golly.

¶ 19    "By March 2011, [DiMatteo] was obviously weakened and depressed and it was clear that his health was failing and that he was dying. Eastman then began to exploit [DiMatteo's] vulnerability and undertook to secure a position of trust and confidence with [DiMatteo]." Eastman "pursued a course of conduct to undermine the friendship and trust that existed between [DiMatteo] and [Golly], to make false statements about [Golly] to [DiMatteo], to cast [Golly] in a disparaging light and to make [Golly] appear to be an unworthy recipient of [DiMatteo's] estate," while simultaneously portraying "himself and his family as victims of [Golly]'s greed and exploititive [*sic*] conduct and to insinuate himself into a position of trust with [DiMatteo]" for the purpose of using his new position of trust to create "an estrangement and loss of trust between [DiMatteo] and [Golly], and to influence [DiMatteo] to include Eastman in his will."

¶ 20    Golly alleges that Eastman made "repeated false statements about [Golly] to [DiMatteo], calculated to undermine [Golly's] character and trustworthiness in [DiMatteo's] eyes," which characterized Golly as greedy and Eastman and his family as victims of Golly's greed. These statements caused DiMatteo to resent Golly. Eastman intended for these statements to convince DiMatteo to change his estate plan to benefit Eastman, to the detriment of Golly. The petition further alleges that, "[o]n information and belief, Eastman's false statements and conduct operated on [DiMatteo] at the time he executed the 2011 Will and caused [DiMatteo] to disinherit [Golly] and to include Eastman in the [2011] will."

¶ 21    The petition further alleges that, "[o]n information and belief," Eastman knew of DiMatteo's vulnerability and exploited DiMatteo's paranoia by criticizing Golly, questioning Golly's "good faith and trustworthiness," and challenging Golly's "worthiness to be a recipient of [DiMatteo]'s estate" for the purpose of insinuating himself into a position of trust with DiMatteo. Eastman's false statements to DiMatteo included assertions that Golly "did not need the money because he was already successful but that Eastman did need it, and that [Golly] was refusing to pay Eastman." These statements were false, as Golly had paid Eastman in full for all the work Eastman told DiMatteo about, and, "on information and belief," Eastman knew these statements to be false.

¶ 22    On or about March 16, 2011, Eastman made inquiries about how to change the will of someone who already had a will. One person to whom Eastman made these inquiries was Alberto Rosillo, a local scrap collector. Eastman told him that the person, DiMatteo, whose will he was planning to have changed was not in good shape and was dying from leukemia, and that, in his effort to convince the person to change his will, Eastman told him that he needed money for his family and that his boss, Golly, was not paying him for his work, creating a hardship for his family. Eastman further told him that he believed that the person, DiMatteo, was not very competent and that he did not have much time to live.

¶ 23    Eastman's false statements were intended to cast Golly in a false light in DiMatteo's eyes and to undermine the confidence that DiMatteo placed in Golly, causing DiMatteo to believe that Golly was not a worthy recipient of his estate. The petition further alleges that these statements were "particularly effective against [DiMatteo] because of [DiMatteo]'s paranoia and susceptibility to believe the worst about others and, on information and belief, the fact that such an approach would be successful in light of [DiMatteo]'s paranoia was known to Eastman."

¶ 24     On or about March 26, 2011, DiMatteo came to Minnesota. He was complaining of a severe headache and pain in his eyes, he could not talk properly, his eyes appeared bloody, and he was visibly physically weak and mentally diminished. He grew increasingly paranoid and easily upset. Eastman traveled to DiMatteo's residence in Blue Earth, Minnesota, seeking to "prevail upon [DiMatteo] who was in a weakened and vulnerable physical, emotional and mental condition to revoke his existing will and to prepare a new will that included Eastman as the beneficiary of [DiMatteo's] estate." The petition further alleges that, on information and belief, Eastman repeated his false statements to DiMatteo for the purpose of angering DiMatteo and causing him to turn against Golly and remove him from his estate plan.

¶ 25     "At or about this time, Rosillo asked Eastman how he was able to get [DiMatteo] to change his will." Eastman told Rosillo that he informed DiMatteo that Golly was not paying him for the work he did, that Golly refused to pay Eastman when Eastman asked to be paid, that Eastman's family was suffering hardship as a result, and that Golly did not need DiMatteo's money, but Eastman did. Eastman then asked Rosillo whether he could "go to jail for pressuring someone to change their will."

¶ 26     "At or about this time," Eastman told Rosillo that he could take down a windmill on some property for scrap metal and parts and haul away scrap iron at the property. The property belonged to DiMatteo, but Eastman told Rosillo that the property would belong to him after DiMatteo died. Rosillo arrived at the property, and shortly thereafter, Eastman and DiMatteo arrived. DiMatteo looked "pale and weak and fell to the ground as he got out of [Eastman's] truck." DiMatteo inquired as to why Rosillo was on his property and told Rosillo to leave his property. Eastman "told Rosillo not to tell [DiMatteo] why he was at the property." DiMatteo asked Eastman whether he trusted Rosillo, and Eastman responded by telling DiMatteo that Rosillo was a friend and that he trusted him. "Eastman attempted to enlist Rosillo in lying to [DiMatteo] about not being paid, and asked Rosillo to tell [DiMatteo] that [Golly] had not paid Eastman for work Eastman had performed for [Golly] at [Golly]'s request. Rosillo declined to do so because he did not believe this was true."

¶ 27     In Rosillo's presence, Eastman told DiMatteo that Golly had not paid him for work Eastman performed on Golly's farm and for work knocking down a trailer, and that this failure to pay created a hardship for Eastman's family. Eastman, in Rosillo's presence, told DiMatteo that "he was not making it financially" due to Golly's failure to pay him, and that he needed to be paid because he had a wife and family to support. DiMatteo became "visibly very angry at [Golly]" and stated that he had trusted Golly to handle his affairs, but in response to this information, "he would 'write-out' [Golly]." DiMatteo stated that he was "upset by the news that [Golly] did not pay Eastman and indicated that since [Golly] did not pay Eastman, he would take care of Eastman and make sure that he got his money." The petition further alleges that, on information and belief, Eastman made these false statements for the purpose of turning DiMatteo against Golly and to induce DiMatteo to remove Golly from his will and to include Eastman instead, and that Eastman's false statements and conduct "operated on [DiMatteo] at the time he executed the 2011 Will and caused [DiMatteo] to disinherit [Golly] and to include Eastman in the [2011] will."

¶ 28     On or about April 8, 2011, DiMatteo executed the 2011 will, revoking the 2010 will and

disinheriting Golly. At no time prior to April 8, 2011, had DiMatteo named Eastman in any will or other estate planning document, as either a beneficiary or in any fiduciary capacity. The petition further alleges that, on information and belief, at the time DiMatteo executed the 2011 will, he was acting under the undue and wrongful influence of Eastman, resulting from the false statements made to him by Eastman. The petition further alleges that, on information and belief, as a result of Eastman's conduct and false statements, Eastman prevailed upon DiMatteo to place his trust and confidence in Eastman, "thereby creating a fiduciary relationship and imposing on Eastman the duties of a fiduciary."

¶ 29    Prior to Eastman's false statements about Golly, DiMatteo had never expressed anger with Golly that could explain his complete disinheritance of him. DiMatteo continued to contact Golly whenever he needed help or when he had health problems. However, "it appeared that there was some change in [DiMatteo] in that he did not appear to trust [Golly] to handle his financial affairs as he had previously and, for example, would not let [Golly] pay [DiMatteo's] LP gas bill from [DiMatteo's] funds as he had done previously." DiMatteo did not inform Golly that he was changing his estate plan and disinheriting him.

¶ 30    After DiMatteo passed away, "Eastman was heard stating that he had been able to prevail upon [DiMatteo] to change his will and leave his estate to [Eastman]."

¶ 31                          D. Count I–Undue Influence

¶ 32    Golly's first count in the petition alleges that Eastman unduly influenced DiMatteo to change his estate plan and revoke the 2010 will. In support, Golly alleges the following facts.

¶ 33    The 2011 will was the result of false statements by Eastman about Golly. Eastman's false statements caused DiMatteo to turn against Golly and execute a new will, to the detriment of Golly and to the benefit of Eastman. DiMatteo was in a vulnerable mental, physical, and emotional position, and Eastman successfully preyed upon this condition, which created a fiduciary and confidential relationship between Eastman and DiMatteo. Eastman "insinuated himself into a position of trust and confidence by, among other things, making repeated false statements to [DiMatteo] criticizing [Golly] and undermining [Golly]'s merit and trustworthiness to [DiMatteo] and preying upon sympathy for Eastman through false statements."

¶ 34    The petition further alleges that, on information and belief, DiMatteo's weakened mental, physical, and emotional condition rendered him increasingly unable to resist Eastman's undue influence and unable to discern the falsity of Eastman's statements regarding Golly. DiMatteo was "suffering the effects of multiple strokes, the end stages of leukemia, was taking numerous medications, displayed an increasingly morbid outlook and was expecting to die very soon, and was increasingly paranoid and suspicious." The petition further alleges that, on information and belief, as a result of the "trusting and fiduciary relationship" between Eastman and DiMatteo, as well as Eastman's undermining of DiMatteo's relationship with Golly, Eastman had the opportunity to, and did, exercise influence over DiMatteo's execution of the 2011 will, "such that the free and natural intention of [DiMatteo] was overwhelmed by the influence of Eastman. As a result, the 2011 Will does not reflect [DiMatteo's] independent intentions, but, rather, the intentions of Eastman."

Eastman owed a fiduciary obligation to DiMatteo not to use influence over him to benefit Eastman at Golly's expense. The petition further alleges that, on information and belief, had Eastman not subjected DiMatteo to undue influence and false statements of fact, DiMatteo would not have executed the 2011 will. Eastman's conduct was "willful, malicious and manifested a wanton disregard for the rights of [Golly]."

¶ 35          E. Count II–Tortious Interference With Testamentary Expectancy

¶ 36    Golly's second count alleges that Eastman tortiously interfered with his testamentary expectancy. In support, Golly alleges the following facts.

¶ 37    "As a natural object of [DiMatteo]'s bounty, [Golly] had an expectancy that he would receive [DiMatteo]'s estate pursuant to the valid 2010 Will." DiMatteo expressly stated to Golly that his intention was to leave his estate to Golly via the 2010 will. DiMatteo "never disavowed or modified [this intent] except as reflected in the unduly influenced 2011 Will and in the statements of [DiMatteo] in response to Eastman's false statements with respect to [Golly]."

¶ 38    The 2011 will "completely denies" Golly any bequest and instead lists Eastman as the sole beneficiary of DiMatteo's estate. The petition further alleges that, on information and belief, Eastman would not have received any portion of DiMatteo's estate had he not unduly influenced DiMatteo.

¶ 39    The petition further alleges that, on information and belief, Eastman knew that DiMatteo was vulnerable to the undue influence he exerted over DiMatteo, and he used the position of trust he created to "unfairly and unlawfully undermine the longstanding friendship and trust that had existed between [DiMatteo] and [Golly]." Eastman's undue influence upon DiMatteo "was to the detriment of [Golly], thereby interfering with [Golly]'s testamentary expectancy." The petition further alleges that, on information and belief, Eastman made his false statements to DiMatteo at the time DiMatteo executed the 2011 will, which disinherited Golly.

¶ 40    Eastman's conduct constituted "a violation of his confidential and fiduciary relationship with [DiMatteo] and breached his confidential and fiduciary obligations owed to [DiMatteo]. Such conduct was undertaken for the personal gain of Eastman and for the purpose of defeating the testamentary expectancy of [Golly]." The petition further alleges that, on information and belief, Eastman intentionally interfered with Golly's testamentary expectancy through exercising undue influence over DiMatteo, abusing a confidential relationship with him, and breaching fiduciary obligations to him. These actions resulted in DiMatteo executing the 2011 will, which was not his free act, but instead "constituted Eastman's substitution of his own interest and intentions in the place of [DiMatteo's] intentions at a time when [DiMatteo] was unable to resist such influence, all to the benefit of Eastman and to the detriment of [Golly]." The petition further alleges that, on information and belief, had Eastman not engaged in this wrongful conduct, Golly would have realized his testamentary expectation pursuant to the 2010 will, and, as a direct and proximate result of Eastman's wrongful conduct, Golly was damaged by not "receiving the portion of the estate that he would have received but for Eastman's interference," and, as a result, has been forced

to incur attorney fees.

¶ 41                    II. Eastman's Section 2-615 Motion to Dismiss

¶ 42    On June 27, 2012, Eastman filed a section 2-615 motion to dismiss the amended petition for failure to state a cause of action. 735 ILCS 5/2-615 (West 2010). Eastman argues that Golly failed to allege sufficient facts to support his claims, and instead only pleaded conclusions. Eastman argues that Golly failed to allege that DiMatteo lacked the requisite capacity to make a will or that DiMatteo was incompetent. Eastman argues that, although Golly alleged in his first petition "that after [DiMatteo] died Eastman was heard to say that he had succeeded in getting [DiMatteo] to change his will," such a statement is not alleged in the amended petition.[3] Eastman argues that Golly failed to plead sufficient facts to show that a fiduciary relationship existed between himself and DiMatteo, but instead merely asserts that such a relationship existed. Eastman further argues that "no facts are alleged to show why [DiMatteo] would trust Eastman or have confided in him or rely on him for anything."

¶ 43    Eastman argues that Golly's allegation of undue influence was lacking because he failed to allege "a specific recital of the manner in which the free will of the testator was impaired at the time the instrument was executed. The mere conclusion that the testator was influenced by the dominant nature of the disproportionate beneficiary is insufficient." Eastman argues that "mere opportunity" to influence someone does not establish undue influence, nor does "advice and persuasion." Furthermore, the existence of a fiduciary relationship or a confidential relationship is not enough to show undue influence; "the relationship must have been used to procure the will and the will of the testator must be overcome by it." Eastman argues that there must be "specific allegations to show how the will of the testator was overcome."

¶ 44    Eastman argues that although the amended petition "states that Eastman tried to get [DiMatteo] to trust him," the facts of how this was done are not alleged, nor is it specifically alleged that DiMatteo did trust Eastman, and trust alone would not create a fiduciary relationship. Therefore, argues Eastman, Golly failed to allege the requisite fiduciary or confidential relationship. Eastman also states that fiduciaries owe obligations to the other person in the relationship and indicates that Eastman owed no duties to DiMatteo.

¶ 45    Eastman next argues that, even had Golly sufficiently alleged a fiduciary relationship, Golly alleges no facts to show how "Eastman's acts procured the will. Persuasion by a fiduciary is not enough." Eastman further argues that "pleading persuasion or lies is not enough," and that Golly needed to allege how Eastman's lies caused DiMatteo to execute a new will when doing so was not his own intention. Eastman argues that alleging that a testator believed someone's lies "does not mean that [the liar's] will has overcome [the testator's]."

---

[3]Paragraph 24 of the amended petition reads as follows: "After decedent's death, Eastman was heard stating that he had been able to prevail upon [DiMatteo] to change his will and leave his estate to him.

¶ 46    Eastman next argues that Golly failed to allege sufficient facts to state a claim for tortious interference with a testamentary expectancy. Specifically, Golly "failed to allege any facts to state a claim for fraud."

¶ 47    Eastman's section 2-615 motion also questions the logic underlying some of Golly's allegations:

> "[Golly] is alleging that [DiMatteo], a paranoid, would trust and believe someone who was a casual acquaintance 14 days earlier and who had, in [DiMatteo's] presence, just told a trespasser [Rosillo, the scrap dealer] not to tell [DiMatteo] why he is there. This, and by saying [Golly] had not paid him, is how Eastman got a paranoid to trust him. And of course we are to believe all this because Rosillo, the trespasser, who knows he is trespassing, says so."

¶ 48    On September 17, 2012, the probate division granted Eastman's section 2-615 motion and dismissed the petition with prejudice. Golly timely appeals.

¶ 49                                    ANALYSIS

¶ 50    Golly raises three issues on appeal: (1) whether the probate division erred when it granted Eastman's section 2-615 motion with prejudice; (2) whether the probate division erred in ruling that the amended petition failed to state a cause of action for undue influence; and (3) whether the probate division erred in ruling that the amended petition failed to state a cause of action for tortious interference with testamentary expectancy.

¶ 51                              I. Standard of Review

¶ 52    "In considering a motion to dismiss, we accept as true all well-pleaded facts and draw all inferences from those facts in favor of the nonmovant." *Lee v. Nationwide Cassel, L.P.*, 174 Ill. 2d 540, 545 (1996) (citing *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 473 (1990)). "We will sustain a dismissal for failure to state a claim only if it clearly appears that no set of facts could be proved under the allegations which would entitle the party to relief." *Lee*, 174 Ill. 2d at 545 (citing *Meerbrey*, 139 Ill. 2d at 473). Whether a complaint should be dismissed under a section 2-615 motion presents a question of law, which we review *de novo*. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 392 (2008) (citing *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 147-48 (2002)). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 53                            II. Section 2-615 Motions

¶ 54    Section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2010)) states that "[a]ll objections to pleadings shall be raised by motion. The motion shall point out specifically the defects complained of, and shall ask for appropriate relief, such as: that a pleading or portion thereof be stricken because substantially insufficient in law, or that the action be dismissed ***." 735 ILCS 5/2-615(a) (West 2010). "If a pleading or a division thereof is objected to by a motion to dismiss or for judgment or to strike out the pleading,

because it is substantially insufficient in law, the motion must specify wherein the pleading or division thereof is insufficient." 735 ILCS 5/2-615(b) (West 2010).

¶ 55    A motion to strike a complaint as being substantially insufficient in law raises the issue of whether the complaint states a cause of action. See *Janes v. First Federal Savings & Loan Ass'n of Berwyn*, 57 Ill. 2d 398, 406 (1974). Often, we say that a pleading or a portion thereof is "dismissed." This is incorrect. Pleadings are stricken in whole or in part; only actions are dismissed. The dismissal of a complaint cannot be equated with a striking of a party's pleading and this distinction is a substantive one which has long been recognized in Illinois. *Bejda v. SGL Industries, Inc.*, 82 Ill. 2d 322, 328 (1980).

¶ 56    A cause of action should not be dismissed on the pleadings unless it clearly appears that no set of facts could be proven which would entitle the pleader to relief. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 488 (1994). For this reason, as a general rule, leave to amend is freely granted when a pleading has been stricken.

¶ 57    When ruling on a section 2-615 motion, "court[s] must accept as true all well-pleaded facts, as well as any reasonable inferences that may arise from them." *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31. However, "a court cannot accept as true a mere conclusion unsupported by specific facts." *Patrick Engineering*, 2012 IL 113148, ¶ 31. Furthermore, such motions do not admit allegations within the body of a pleading that are in conflict with the facts contained within an exhibit to that pleading. *Outboard Marine Corp. v. James Chisholm & Sons, Inc.*, 133 Ill. App. 3d 238, 245 (1985).

¶ 58    A motion to strike or dismiss concedes that all well-pleaded facts, as well as all reasonable inferences that may be drawn therefrom, in the pleading under attack are true. *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 47. Only the well-pleaded facts are taken as true; conclusions of law or conclusions of fact unsupported by allegations of specific facts upon which such conclusions rest are not taken as true and are not to be considered by the court in ruling on the motion. *Curtis v. Birch*, 114 Ill. App. 3d 127, 129 (1983). A motion to dismiss should not be granted so long as a good cause of action has been stated even if that cause of action is not the one that the plaintiff intended to assert. *Illinois Graphics Co.*, 159 Ill. 2d at 488. For example, where the well-pled facts in a complaint support a negligence theory of liability, a motion to strike the complaint must be denied even though the plaintiff did not argue that the defendant was negligent but incorrectly argued that the defendant was strictly liable for the harm caused. *Arca v. Colonial Bank & Trust Co. of Chicago*, 265 Ill. App. 3d 498, 502 (1994). No pleading is bad in substance if it sets forth sufficient information to reasonably inform the opposite party of the nature of the claim or defense which said party is called upon to meet. 735 ILCS 5/2-612(b) (West 2010). A complaint should not be stricken and the action dismissed unless the court can conclude that there is *no possible set of facts* in support of the allegations in the complaint that would entitle the plaintiff to relief based on the pleadings themselves. *Canel v. Topinka*, 212 Ill. 2d 311, 318 (2004); *Nickum*, 159 Ill. 2d at 488.

¶ 59                    III. The Sufficiency of the Amended Petition

¶ 60    Golly argues that the amended petition includes extensive, factually specific allegations

setting out Eastman's actions which amounted to undue influence and tortious interference with a testamentary expectation. In response, Eastman argues that Golly failed to plead sufficient facts to state his claims and that Golly relied on conclusions rather than facts.

¶ 61                                        A. Undue Influence

¶ 62       Undue influence necessary to invalidate a will is that influence which prevents the testator from exercising his own free will in the disposition of his estate. *In re Estate of Maher*, 237 Ill. App. 3d 1013, 1017 (1992). Undue influence must be directly connected with the execution of the instrument, operate at the time it was made, and be directed toward procuring the will in favor of a particular party or parties. *Maher*, 237 Ill. App. 3d at 1017. Our Illinois Supreme Court has defined "undue influence" as follows:

> " '[U]ndue influence which will invalidate a will is " 'any improper *** urgency of persuasion whereby the will of a person is over-powered and he is indeed induced to do or forbear an act which he would not do or would do if left to act freely.' [Citation.]" To constitute undue influence, the influence " 'must be of such a nature as to destroy the testator's freedom concerning the disposition of his estate and render his will that of another.' " [Citations.]
>
> What constitutes undue influence cannot be defined by fixed words and will depend upon the circumstances of each case. [Citation.] The exercise of undue influence may be inferred in cases where the power of another has been so exercised upon the mind of the testator as to have induced him to make a devise or confer a benefit contrary to his deliberate judgment and reason. [Citation.] Proof of undue influence may be wholly circumstantial. [Citation.] The influence may be that of a beneficiary or that of a third person which will be imputed to the beneficiary. [Citations.] False or misleading representations concerning the character of another may be so connected with the execution of the will that the allegation that such misrepresentations were made to the testator may present triable fact questions on the issue of undue influence.' [Citations.]" *DeHart v. DeHart*, 2013 IL 114137, ¶ 27 (quoting *In re Estate of Hoover*, 155 Ill. 2d 402, 411 (1993)).

*DeHart* makes clear that there is a difference between alleging a cause of action for undue influence and alleging a presumption of undue influence. After defining undue influence and examining the facts of the case, our supreme court found that the "plaintiff has alleged sufficient facts to state a cause of action." *DeHart*, 2013 IL 114137, ¶ 28. In the next paragraph, the court said the following:

> "Additionally, we note that the appellate court also found that [the] plaintiff alleged sufficient facts to *allege* a presumption of undue influence. We agree with that observation. We note, however, that a presumption of undue influence is something that can only be ultimately determined–at the earliest–after the close of plaintiff's case. See, *e.g.*, *In re Estate of Glogovesk*, 248 Ill. App. 3d 784, 798 (1993). Once the presumption is established, the defendant would then have the burden to rebut it." (Emphasis in original.) *DeHart*, 2013 IL 114137, ¶ 29.

A *presumption* of undue influence will arise under certain circumstances. *DeHart*, 2013 IL

-12-

114137, ¶ 30. One such circumstance is where: (1) a fiduciary relationship exists between the testator and a person who receives a substantial benefit from the will; (2) a testator who was in a dependent situation where the beneficiary was in a dominant role; (3) a testator who placed his trust and confidence in the beneficiary; and (4) a will that was prepared or executed in circumstances where the beneficiary was instrumental or participated. *DeHart*, 2013 IL 114137, ¶ 30.

¶ 63 The active agency of the chief beneficiary in procuring a will, especially in the absence of those having an equal claim on the estate of a testator whose mind is debilitated by age and illness, is a circumstance indicating the probable exercise of undue influence. *Maher*, 237 Ill. App. 3d at 1018 (citing *Mitchell v. Van Scoyk*, 1 Ill. 2d 160, 172 (1953)). "[T]his presumptive undue influence arises irrespective of the existence of a fiduciary relationship between the testator and the beneficiary." *Maher*, 237 Ill. App. 3d at 1018. See also *Schmidt v. Schwear*, 98 Ill. App. 3d 336, 345 (1981); *Swenson v. Wintercorn*, 92 Ill. App. 2d 88, 101-02 (1968) (even in the absence of a fiduciary relationship, where one procures the execution of a will largely benefitting himself to the detriment of others having an equal claim to the bounty of the testator, who is infirm due to age or illness, a presumption arises that the beneficiary used undue influence).

¶ 64 In *DeHart*, the plaintiff filed a complaint contesting the will of his adoptive father and alleging undue influence in the creation of the contested will. *DeHart*, 2013 IL 114137, ¶ 1. The plaintiff alleged that the decedent had previously executed a will naming the plaintiff, the plaintiff's sons, and the decedent's church as beneficiaries. *DeHart*, 2013 IL 114137, ¶ 7. The plaintiff further alleged that the decedent married the defendant, who was 29 years younger than the decedent, within one year of meeting her. *DeHart*, 2013 IL 114137, ¶ 8. The plaintiff alleged that after the decedent and the defendant had been married for one year, the decedent signed a new will, which stated that he " '[has] no children.' " *DeHart*, 2013 IL 114137, ¶ 9. Plaintiff alleged that, in the time between the decedent's wedding to the defendant and the decedent signing the new will, the "defendant made several misrepresentations to [the decedent] concerning plaintiff and his character, each of which was told to [the decedent] shortly before the execution of the will." *DeHart*, 2013 IL 114137, ¶ 11. These misrepresentations included telling the decedent that the plaintiff was not his son, not telling the decedent that the plaintiff and his family had called the decedent on the telephone and had sent him cards and letters, and intercepting and destroying these cards, letters, and telephone calls. *DeHart*, 2013 IL 114137, ¶ 11.

¶ 65 Our Illinois Supreme Court quoted *In re Estate of Hoover*, 155 Ill. 2d 402 (1993), to define "undue influence" and states that " '[f]alse or misleading representations concerning the character of another may be so connected with the execution of the will that the allegation that such misrepresentations were made to the testator may present triable fact questions on the issue of undue influence.' " *DeHart*, 2013 IL 114137, ¶ 27 (quoting *Hoover*, 155 Ill. 2d at 411-12). The *DeHart* court characterized the *Hoover* case as concerning a " 'subtle, invidious kind of undue influence' in which the testator's will was overborne by a series of misrepresentations by the defendant about the plaintiff's character." *DeHart*, 2013 IL 114137, ¶ 27 (quoting *Hoover*, 155 Ill. 2d at 413). In such a case, "the testator may act as if directed and guided by his own agency but that agency may have been overpowered by

-13-

'secret influences.' " *DeHart*, 2013 IL 114137, ¶ 27 (quoting *Hoover*, 155 Ill. 2d at 414). Plaintiffs may introduce circumstantial evidence to demonstrate that the influence was connected with and operative at the time of the execution of the will and that the influence was directed toward procuring the will in favor of the beneficiary. *DeHart*, 2013 IL 114137, ¶ 27 (citing *Hoover*, 155 Ill. 2d at 414).

¶ 66    Our supreme court analogized the facts before it to *Hoover*, finding that in both cases, the plaintiff alleged that he had a close relationship with the decedent and that the decedent disinherited the plaintiff shortly after the defendant made the misrepresentations. *DeHart*, 2013 IL 114137, ¶¶ 27-28. The court determined that the plaintiff had alleged sufficient facts to survive a section 2-615 motion to dismiss and state a cause of action for undue influence. *DeHart*, 2013 IL 114137, ¶ 28.

¶ 67    *DeHart* is instructive to the facts of the case at bar. Golly alleges that he shared a close relationship with DiMatteo for many years and that DiMatteo planned to leave his estate to Golly. Golly alleges that Eastman made false statements of fact concerning Golly's character to DiMatteo and that shortly after Eastman made these statements, DiMatteo executed a new will, naming Eastman as the sole beneficiary.

¶ 68    Eastman argues that *DeHart*, *Hoover*, and *Sterling v. Kramer*, 15 Ill. App. 2d 230 (1957), all of which concern defendants making false statements of fact regarding the plaintiffs to the decedents, are distinguishable. Eastman argues that although these cases allow plaintiffs to allege that the will of the testator was overcome through circumstantial evidence, Golly failed to allege sufficient facts to show circumstantial evidence of how Eastman unduly influenced DiMatteo to create the 2011 will. *DeHart*, 2013 IL 114137, ¶ 27; *Hoover*, 155 Ill. 2d at 414. Eastman also argues that, unlike in *DeHart*, *Hoover*, and *Sterling*, in which the plaintiffs were family members of the decedents, Golly was not related to DiMatteo. Eastman argues that Golly alleges two false statements to DiMatteo and, thus, did not make a "series of different misrepresentations" as is required by *DeHart*, *Hoover*, and *Sterling.* Eastman further distinguished *DeHart* by arguing that the defendant in *DeHart* had power of attorney over the decedent and, thus, was in a fiduciary relationship with the defendant by law. *DeHart*, 2013 IL 114137, ¶¶ 10, 31.

¶ 69    We do not find these arguments persuasive. Although *DeHart*, *Hoover*, and *Sterling* all had plaintiffs who were related to the decedents, none of the decisions ever stated that familial relationships were a factor in the analysis. Eastman argues that Golly failed to allege "how [Eastman] was able to substitute his will for [DiMatteo's] in just a few weeks,"[4] and states that he, "like anyone else, was entitled to ask [DiMatteo] for his money. Asking someone to make a will in your favor is not undue influence." See *Thompson v. Bennett*, 194 Ill. 57, 65 (1901). This argument ignores the fact that the petition alleges that Eastman made

_____

[4]Throughout Eastman's argument, he makes statements challenging the truth of the facts alleged in the petition, such as here when he indicates that the time span in which he acted was too short to impose his will upon DiMatteo. When reviewing a section 2-615 motion to dismiss, we must take all well-pleaded facts as true. *Khan*, 2012 IL 112219, ¶ 47. Therefore, we shall ignore all of Eastman's arguments that challenge the truth of the facts alleged.

statements inquiring how to convince someone to change his will and whether he could "go to jail for pressuring someone to change their will." This shows that Eastman was aware that any requests he made of DiMatteo to change his will involved wrongdoing, because we must take this allegation as true for the purpose of the section 2-615 motion. Furthermore, the petition does allege how, over time, Eastman convinced DiMatteo to change his will by giving his estate to Eastman instead of Golly. In *Hoover*, the defendants argued that the plaintiffs failed to provide evidence[5] that the defendants' influence was directly connected with the execution of the codicils that disinherited the plaintiffs or that any influence defendants exerted was directed toward procuring a will in their favor. *Hoover*, 155 Ill. 2d at 413. Our supreme court found the defendants' argument "misguided." *Hoover*, 155 Ill. 2d at 413. The complaint in *Hoover* alleged that the decedent's will was "overbourne by a series of misrepresentations about [the plaintiff's] character." *Hoover*, 155 Ill. 2d at 413.

¶ 70        "In essence, the complaint alleges that these misrepresentations were internalized by [the decedent] and prompted him to act in accordance with the influencer's intent rather than his own original intent." *Hoover*, 155 Ill. 2d at 413-14. "Under these circumstances, the testator may act as if directed and guided by his own agency but that agency may have been overpowered by 'secret influences.' " *Hoover*, 155 Ill. 2d at 414 (citing *Sterling*, 15 Ill. App. 2d at 237).

¶ 71        In the case at bar, Golly alleges facts indicating that DiMatteo was susceptible to misrepresentations and that Eastman made misrepresentations concerning Golly's character. Golly alleges that Eastman told DiMatteo that Golly was greedy and refused to pay Eastman monies owed to him for work performed. Golly alleges that Eastman also stated that Golly did not need DiMatteo's money because he was already successful, but Eastman did need DiMatteo's money because he was unable to support his family as a result of Golly not paying him for work performed. Golly alleges that Eastman attempted to enlist Rosillo, the scrap dealer, to agree to the false statements that Golly had not paid Eastman for work performed, and, as a result, Eastman and his family were suffering financial hardship, but Rosillo refused. Golly alleges that, in response to these misrepresentations, DiMatteo became "visibly very angry at [Golly]" and said that he would "write-out [Golly]." Like in *Hoover*, the allegations in Golly's petition lead to the logical inference that DiMatteo internalized these misrepresentations and prompted him to act in accordance with Eastman's intent, rather than his own. *Hoover*, 155 Ill. 2d at 413-14. Eastman cites no authority to argue how many misrepresentations are required to create a "series of misrepresentations," and neither *DeHart* nor *Hoover* nor *Sterling* bases its decision on how many misrepresentations were made.

¶ 72        Eastman cites *In re Estate of Sutera*, 199 Ill. App. 3d 531 (1990), and *In re Estate of Julian*, 227 Ill. App. 3d 369, 375 (1991), to argue that the facts of this case are distinguishable from *DeHart*, *Hoover*, and *Sterling*. In *Sutera*, the petition alleged that the decedent was homosexual, that the respondent " 'threatened to expose the [decedent] unless he agreed [*sic*] to do whatever [the] respondent *** wished,' " and that the " 'domination and

_____

[5]Unlike the case at bar, *Hoover* decided whether the trial court improperly granted summary judgment to the defendant on the issue of undue influence. *Hoover*, 155 Ill. 2d at 408.

intimidation by said respondent was complete and exclusive resulting in the [decedent] being totally without any free will of his own.' " *Sutera*, 199 Ill. App. 3d at 535. The court distinguished *Sterling*, holding that the petition did not included the "detailed allegations of a conspiracy" alleged in *Sterling*, and instead failed to allege how the threat of exposure overcame the decedent's free will. *Sutera*, 199 Ill. App. 3d at 538. In *Julian*, the petition alleged that the beneficiary, who was the decedent's son, managed the decedent's business when the decedent was no longer healthy enough to do so himself. *Julian*, 227 Ill. App. 3d at 374. As a result, the beneficiary was the decedent's main source of income. *Julian*, 227 Ill. App. 3d at 374. The petition then alleged that the beneficiary overcame the decedent's will by making "repeated threats and demands that unless [the] decedent gave [the beneficiary] control over the business and assured that [the beneficiary] would retain control by transferring ownership of the business to [the beneficiary] by contract or will," the beneficiary would terminate his employment with the business. *Julian*, 227 Ill. App. 3d at 374-75. The court stated that, although the petitioners "come[ ] closer [than the *Sutera* petitioner] to specifically alleging the manner in which the alleged influence operated to overcome the free will of the [decedent]," they failed to allege undue influence with the requisite specificity required to survive a motion to dismiss. *Julian*, 227 Ill. App. 3d at 376-77.

¶ 73    We find both cases distinguishable. Unlike the case at bar, which included the alleged false statements made by Eastman to DiMatteo, the manner in which those statements operated on DiMatteo to overcome his will, and the allegation that DiMatteo stated that he would "write-out" Golly as a result of the false statements, the petitions in *Sutera* and *Julian* fail to allege how the threats operated to overcome the decedents' will. Furthermore, the court in *Julian* states that the petition failed to allege that the beneficiary directly participated in the procurement or the execution of the will. *Julian*, 227 Ill. App. 3d at 377. Golly alleges that Eastman directly participated in the procurement or execution of the 2011 will:

> "Eastman repeated the false claim that [Golly's] failure to pay him created a hardship for his family, that he was not making it financially due to [Golly's] failure to pay [Eastman] for his work and that he needed to be paid because he had a wife and family to support. In response, [DiMatteo] got visibly very angry at [Golly] for not paying Eastman and stated that he had trusted [Golly] to handle his affairs and that (in response to this information) he would 'write-out' [Golly]. [DiMatteo] stated that he was upset by the news that [Golly] did not pay Eastman and indicated that since [Golly] did not pay Eastman, he would take care of Eastman and make sure he got his money."

See *Sterling*, 15 Ill. App. 2d at 237 (stating that "[w]here the defendant plays an active role in procuring the execution of a will it is not essential to show that he was present at the signing of the instrument in order to invalidate the will on the ground of undue influence"). The *Julian* court also indicated that misrepresentations, which were present in *Sterling* and alleged in the case at bar, are more likely to state a cause of action for undue influence than threats, which were present in *Sutera* and *Julian*. The *Julian* court stated that *Sutera* distinguished *Sterling* by pointing to the allegation of a conspiracy to misrepresent facts to the decedent. *Julian*, 227 Ill. App. 3d at 377 (citing *Sutera*, 199 Ill. App. 3d at 538). The *Julian* court then stated that "[i]n this case, as in *Sutera*, there are no such allegations of

-16-

misrepresentation." *Julian*, 227 Ill. App. 3d at 377.

¶ 74    Eastman cites three cases to argue that Golly failed to allege facts to "show that Eastman had anything to do with preparation or the execution of [DiMatteo's] will." In *Swenson v. Wintercorn*, 92 Ill. App. 2d 88 (1968), the defendants were present when the decedent signed her will. *Swenson*, 92 Ill. App. 2d at 101. In *Smith v. Henline*, 174 Ill. 184 (1898), the beneficiaries of the contested will were present when it was executed. *Smith*, 174 Ill. at 196. In *Cheney v. Goldy*, 225 Ill. 394 (1907), the beneficiary held the decedent's arm to assist him in signing the contested will. *Cheney*, 225 Ill. at 398. Such activity is relevant to determining whether there was undue influence, but its absence is not fatal to a petition. In fact, *Sterling* states that "[w]here the defendant plays an active role in procuring the execution of a will it is not essential to show that he was present at the signing of the instrument in order to invalidate the will on the ground of undue influence." *Sterling*, 15 Ill. App. 2d at 237.

¶ 75    Eastman next argues that "[r]egardless of whether or not a fiduciary relationship is required to show undue influence, [Golly] rests his pleading on a breach of fiduciary duty," and Golly failed to allege the existence of a fiduciary relationship. This argument is not persuasive. A motion to dismiss should not be granted so long as a good cause of action has been stated even if that cause of action is not the one that the plaintiff intended to assert. *Illinois Graphics Co.*, 159 Ill. 2d at 488. Golly has alleged sufficient facts to state a claim of undue influence.

¶ 76                              B. Tortious Interference

¶ 77    To state a cause of action of tortious interference with a testamentary expectation, plaintiffs must allege sufficient facts to indicate the following: "(1) the existence of his expectancy; (2) defendant's intentional interference therewith; (3) tortious conduct *such as* undue influence, fraud, or duress; (4) a reasonable certainty that the expectancy would have been realized but for the interference; and (5) damages." (Emphasis added.) *DeHart*, 2013 IL 114137, ¶ 39. "A will contest is distinct from a tort action for intentional interference with [a] testamentary expectancy." *DeHart*, 2013 IL 114137, ¶ 39. "One who, by fraud, duress, *or other tortious means* intentionally prevents another from receiving from a third person an inheritance or gift that he otherwise would have received is subject to liability to the other for the loss." (Emphasis added.) *DeHart*, 2013 IL 114137, ¶ 39. "The remedy is not setting aside of the will, but a judgment against the individual defendant, which would include money damages in the amount of the benefit tortiously acquired." *DeHart*, 2013 IL 114137, ¶ 39.

¶ 78    According to *DeHart*, the element of damages in a tortious interference claim cannot be known until the will contest has been resolved. *DeHart*, 2013 IL 114137, ¶ 40. If Golly were to succeed on the undue influence claim, the will would be set aside, and his tortious interference count would be set aside "because the adequacy of the probate relief would be undisputed and there would therefore be no damages in tort." *DeHart*, 2013 IL 114137, ¶ 41. If Golly were not to succeed on the undue influence claim, he could proceed against Eastman on the tortious interference claim in the same court. *DeHart*, 2013 IL 114137, ¶ 41.

¶ 79    Eastman argues that Golly failed to plead that he knew of the previous will, and thus he

could not have intentionally interfered with the will, and that the petition includes "no allegations that support a finding of tortious conduct." We do not find his argument persuasive.

¶ 80    The allegation that a prior will existed is a sufficient allegation of an expectancy. *DeHart v. DeHart*, 2012 IL App (3d) 090773, ¶ 33, *aff'd*, 2013 IL 114137, ¶¶ 39-41.[6] Golly alleges that the 2010 will named him as beneficiary and has thus satisfied the first element of tortious interference with a testamentary expectancy. Eastman argues that Golly does not explicitly state that Eastman knew of the 2010 will and that, therefore, Golly failed to allege that Eastman intended to interfere with Golly's expectancy. However, Golly alleges that Eastman inquired how to *change* the will of a person who already had a will and that, after DiMatteo died, Eastman stated that he had succeeded in convincing DiMatteo to *change* his will. From these allegations, which we must accept as true at this point in the proceedings, we can infer that because Eastman referred to "*changing*" a will, both prior to and after DiMatteo executed the 2011 will, he must have known that the 2010 will existed. As we have stated above, Golly has alleged that Eastman unduly influenced DiMatteo to execute the 2011 will, and thus, Golly has satisfied the third element of pleading a cause of action for tortious interference. *DeHart*, 2013 IL 114137, ¶ 39 (tortious conduct includes undue influence, fraud, and duress). Finally, Golly alleges that DiMatteo expressly stated to Golly that his intention was to leave his estate to Golly via the 2010 will and that DiMatteo "never disavowed or modified [this intent] except as reflected in the unduly influenced 2011 Will and in the statements of [DiMatteo] in response to Eastman's false statements with respect to [Golly]." Therefore, Golly has alleged that he reasonably would have remained DiMatteo's beneficiary but for Eastman's interference.

¶ 81    Golly has therefore sufficiently alleged the first four elements of a cause of action for tortious interference with a testamentary expectation. The fifth, damages, "can only be known if it exists after the resolution of" the will contest. *DeHart*, 2013 IL 114137, ¶ 40.


¶ 82                                C. Information and Belief

¶ 83    Golly's complaint repeatedly alleges facts based on "information and belief." In some cases, certain relevant facts of a cause of action will not be known to the plaintiff. "Where facts of necessity are within defendant's knowledge and not within plaintiff's knowledge, a complaint which is as complete as the nature of the case allows is sufficient." *Yuretich v. Sole*, 259 Ill. App. 3d 311, 313 (1994). At times, plaintiffs "may be forced to present allegations of express authority upon information and belief." *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 40. " '[A]n allegation made on information and belief is not equivalent to an allegation of relevant fact' [citation], but at the pleading stage a

---

[6]The Illinois Supreme Court affirmed the appellate court's finding that the *DeHart* plaintiff sufficiently alleged a cause of action for tortious interference with a testamentary expectancy. *DeHart*, 2013 IL 114137, ¶ 40. However, the supreme court did not provide the reasoning for doing so that was present in the appellate court decision. Therefore, we cite to the appellate court case to provide an explanation as to how the plaintiff adequately alleged a cause of action.

plaintiff will not have the benefit of discovery tools" to discern facts hidden from the plaintiff. *Patrick Engineering*, 2012 IL 113148, ¶ 40 (quoting *Whitley v. Frazier*, 21 Ill. 2d 292, 294 (1961) (holding that, in an equitable estoppel action against a municipality, before discovery, plaintiffs will not have access to information about the municipality's "bureaucratic hierarchy"). The plaintiff *will* have knowledge of what he did to learn the facts that he alleges on information and belief, and should allege any efforts taken to discover those facts. *Patrick Engineering*, 2012 IL 113148, ¶ 40.

¶ 84    Golly failed to allege how he discovered the facts that he alleges upon information and belief. Thus, these allegations are not the equivalent of allegations of relevant facts. *Patrick Engineering*, 2012 IL 113148, ¶ 40 (citing *Whitley*, 21 Ill. 2d at 292). However, a cause of action should not be dismissed on the pleadings unless it clearly appears that no set of facts could be proven which would entitle the pleader to relief. *Illinois Graphics Co.*, 159 Ill. 2d at 488. For this reason, as a general rule, leave to amend is freely granted when a pleading has been stricken. We therefore reverse the probate division's order dismissing the petition with prejudice and order that Golly be given leave to file an amended petition, alleging how he discovered the facts he pleads on information and belief.

¶ 85                                    CONCLUSION

¶ 86    For the above reasons, we reverse the probate division's order, and order that it grant Golly leave to file an amended petition. Golly has sufficiently pleaded a set of facts that could prove undue influence and tortious interference with a testamentary expectancy.

¶ 87    Reversed and remanded with instructions.